**STATE OF RHODE ISLAND**                                **SUPERIOR COURT**
**PROVIDENCE**

**IN RE: ASBESTOS LITIGATION**

JANICE MAKIN as personal representative of the          :          C.A. No.: to be assigned
estate of JOSEPH F. FUSCO                                :
(PROBATE PENDING)                                        :          09-0736
          Plaintiff,                                     :
                                                         :
v.                                                       :
                                                         :
84 LUMBER COMPANY                                        :
AII ACQUISITION LLC f/k/a ATHLONE                        :
          INDUSTRIES, INC. f/k/a HOLLAND                 :
          FURNACE COMPANY                                :
A.O. SMITH CORPORATION                                   :
A.W. CHESTERTON COMPANY                                  :
ACE HARDWARE CORPORATION                                 :
ALCOA, INC.                                              :
ALFA LAVAL, INC.                                         :
AMERICAN BILTRITE, INC.                                  :
AURORA PUMP COMPANY                                      :
AVENTIS CROPSCIENCE USA, Inc. n/k/a                      :
          BAYER CROPSCIENCE, INC. as successor :
          to AMCHEM PRODUCTS, INC.                       :
BELL & GOSSETT a division of                             :
          ITT CORPORATION                                :
BIRD, INC.                                               :
BONDEX INTERNATIONAL, INC.                               :
BORGWARNER MORSE TEC INC. individually                   :
          and as successor to BORG-WARNER               :
          CORPORATION                                    :
BRIGGS & STRATTON CORPORATION                            :
BROCKTON FURNACE & DUCT                                  :
          DISTRIBUTORS                                   :
BRYANT HEATING AND COOLING SYSTEMS :
BUFFALO PUMPS, INC.                                      :
BURNHAM LLC f/k/a BURNHAM                                :
          CORPORATION individually and as               :
          successor to KEWANEE                           :
CAMERON f/k/a COOPER CAMERON                             :
          individually and as successor to COOPER       :
          BESSEMER and as parent to                     :
          COOPER COMPRESSION                             :
CARRIER CORPORATION                                      :

Rec'd
2/6/09
1:56

CBS CORPORATION f/k/a VIACOM, INC.                  :
    successor by merger to CBS                       :
    CORPORATION f/k/a WESTINGHOUSE                   :
    ELECTRIC CORPORATION
CERTAINTEED CORPORATION                            :
CHRYSLER LLC f/k/a DAIMLER CHRYSLER                 :
    f/k/a CHRYSLER MOTOR CORPORATION:
    f/k/a CHRYSLER CORP.                             :
CLEAVER-BROOKS a division of
    AQUA-CHEM, INC.                                  :
CLIFTON ASSOCIATES, INC. f/k/a JOHNSON             :
    ASBESTOS CORPORATION                             :
COLEMAN HEATING & AIR CONDITIONING                 :
COLUMBIA BOILER CO.                                :
COMPUDYNE CORPORATION individually and
    as successor to YORK SHIPLEY                     :
CONWED CORPORATION                                 :
CRANE CO. individually and as successor to         :
    JENKINS BROS. and WEIMAN PUMP                    :
    MANUFACTURING COMPANY                            :
CROWN CORK & SEAL CO., INC                         :
DAIMLER TRUCKS NORTH AMERICA                       :
DAL-TILE CORPORATION                               :
DANA CORPORATION                                   :
DAP, INC.                                          :
DETROIT DIESEL CORPORATION                         :
DOMCO PRODUCTS TEXAS L.P. f/k/a                    :
    AZROCK INDUSTRIES, INC.                          :
THE DOW CHEMICAL COMPANY individually             :
    and as successor to UNION CARBIDE                :
    CORPORATION                                      :
ECKEL INDUSTRIES, INC.                             :
ELLIOT TURBOMACHINERY CO., INC.                    :
F. W. WEBB COMPANY                                 :
FAIRBANKS MORSE ENGINE an unincorporated   :
    division of COLTEC INDUSTRIES, INC.              :
FAIRBANKS MORSE PUMP COMPANY                       :
FLOWSERVE, INC. a/k/a FLOWSERVE US, INC.   :
    individually and as successor to                :
    ALDRICH PUMPS                                    :
FORD MOTOR COMPANY                                 :
FOSTER WHEELER LLC                                 :
FREIGHTLINER, LLC
GARDNER DENVER, INC.                               :
GARLOCK SEALING TECHNOLOGIES, LLC          :
    successor by merger to GARLOCK, INC.             :

GENERAL ELECTRIC COMPANY :
GENERAL MOTORS CORPORATION :
GENUINE PARTS COMPANY d/b/a NAPA :
     individually and as parent to RAYLOC :
GEORGIA-PACIFIC LLC f/k/a :
     GEORGIA-PACIFIC CORPORATION :
THE GOODYEAR TIRE & RUBBER COMPANY :
GOULDS PUMPS, INCORPORATED :
H.B. FULLER COMPANY :
H.B. SMITH CO. :
HENRY COMPANY individually and as successor :
     in interest to MONSEY PRODUCTS :
     COMPANY :
HOMASOTE COMPANY :
HONEYWELL INTERNATIONAL, INC. f/k/a :
     ALLIEDSIGNAL, INC. f/k/a :
     THE BENDIX CORPORATION :
HOPEMAN BROTHERS, INC. :
IKO INDUSTRIES, INC. :
IMO INDUSTRIES, INC. :
INGERSOLL-RAND COMPANY :
INTERNATIONAL PAPER COMPANY f/k/a :
     MANNING PAPER SUPPLY :
J.H. FRANCE REFRACTORIES COMPANY :
JOHNSON CONTROLS, INC. :
KAISER GYPSUM COMPANY, INC. :
KENTILE FLOORS, INC. :
LENNOX INDUSTRIES, INC. :
LESLIE CONTROLS, INC. :
LYNXX INTERNATIONAL CORPORATION :
     individually and as parent to PROKO :
     INDUSTRIES, INC. :
MELRATH GASKET, INC. :
MESTEK, INC. individually and as parent to :
     HYDROTHERM :
METROPOLITAN LIFE INSURANCE COMPANY :
MIDCO INTERNATIONAL, INC. :
THE NASH ENGINEERING COMPANY :
NATIONAL AUTOMOTIVE PARTS :
     ASSOCIATION :
NEW ENGLAND INSULATION CO., INC. :
NEW ENGLAND INSULATION CO. :
P.I.C CONTRACTORS, INC. :
PACKINGS & INSULATION CORPORATION :
PECORA CORPORATION :
PEERLESS INDUSTRIES, INC. d/b/a PEERLESS :

3

HEATER COMPANY                                      :
PNEUMO ABEX LLC individually and as                :
    successor to ABEX CORPORATION               :
R.P.M. INTERNATIONAL, INC.                         :
    individually and as successor to            :
    BONDEX INTERNATIONAL, INC.                   :
R.W. BECKETT CORPORATION                           :
RED DEVIL, INC.                                    :
RHEEM MANUFACTURING COMPANY, INC.                  :
    a/k/a RHEEM/RUDD                             :
RILEY POWER INC. f/k/a D.B. RILEY INC.             :
    f/k/a RILEY STOKER CORPORATION              :
ROBERT A. KEASBEY COMPANY                          :
SEARS, ROEBUCK AND CO.                             :
SELBY BATTERSBY & CO. n/k/a                        :
    SB DECKING COMPANY                           :
SELKIRK CORP. f/k/a SELKIRK, LLC                   :
SOS PRODUCTS COMPANY, INC.                         :
STERLING FLUID SYSTEMS (USA) LLC  f/k/a            :
    PEERLESS PUMP COMPANY                        :
STERLING TRUCK CORPORATION                         :
TACO, INC.                                         :
TAMMS INDUSTRIES, INC. individually and as         :
    successor to A.C. HORN & COMPANY             :
TARKETT NORTH AMERICA, INC.                        :
TECHNICAL ADHESIVES LIMITED                        :
TILE PERFECT a division of ROANOKE                 :
    COMPANIES GROUP, INC.                        :
THE FALK CORPORATION                               :
TRANE US INC., f/k/a                               :
    AMERICAN   STANDARD INC.                     :
TREMCO INC.                                        :
TYCO FIRE PRODUCTS LP individually and as          :
    successor to YARWAY CORPORATION              :
    and as parent to TYCO VALVES AND             :
    CONTROLS, LP                                 :
TYCO INTERNATIONAL MANAGEMENT                      :
    COMPANY f/k/a                                :
    TYCO INTERNATIONAL (US) INC.                 :
TYCO VALVES & CONTROLS                             :
    LIMITED PARTNERSHIP                          :
U.S. PLYWOOD COMPANY                               :
UNION CARBIDE CORPORATION                          :
UNITED GILSONITE LABORATORIES                      :
UNITED TECHNOLOGIES CORPORATION                    :
UTICA BOILER COMPANY, INC. n/k/a                   :

ECR INTERNATIONAL, INC.                  :
YARWAY CORPORATION                       :
THE W.W. HENRY COMPANY                   :
WALDO BROS. COMPANY                      :
WARREN PUMPS LLC                         :
WEIL-MCLAIN a division of THE            :
    MARLEY-WYLAIN COMPANY           :
WELCOTE MANUFACTURING COMPANY            :
WEYERHAUSER COMPANY                      :
WHIRLPOOL CORPORATION                    :
         *Defendants.*              :

## COMPLAINT

1. Plaintiff, Janice Makin (hereinafter referred to as "Plaintiff"), brings forth this suit on behalf

   of the estate of Joseph Fusco (hereinafter "decedent").

2. Each of the Defendants named in the caption above have conducted business in the state of

   Rhode Island and have produced, manufactured or distributed asbestos and/or asbestos-

   containing products with the reasonable expectation that such products would be used or

   consumed in this state. The Defendants' products were so used or consumed in this state,

   and the Defendants committed the tortuous acts set forth below in this state.

## FIRST COUNT
### (Failure to Warn)

3. Paragraphs 1 and 2 are incorporate herein as if set forth in full.

4. The Decedent was exposed to various asbestos containing products. Such asbestos

   exposure contributed in part or totally to the Decedent's contraction of asbestos-related

   mesothelioma and other asbestos-related pathologies.

5. The Decedent was exposed to various asbestos containing products secondarily. Such

   secondary exposure to asbestos contributed in part or totally to the Decedent's contraction

   of asbestos-related mesothelioma and other asbestos-related pathologies.

6. The Decedent was exposed to and did inhale and/or ingest asbestos dust, fibers, and particles that came from the asbestos products that were contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed and/or sold by the Defendants.

7. Upon information and belief, the Defendants, through their agents and employees, mined, processed, manufactured, designed, tested and/or packaged various asbestos-containing products, and supplied, distributed, delivered, marketed and/or sold said asbestos-containing products to the employer(s) of the Decedent, or to others working at the various jobsites where the Decedent, were employed, or to third persons who, in turn, delivered and sold such products and materials to such employers or to others working at such jobsites for use by employees, including the Decedent, or others through which the Decedent was secondarily exposed.

8. Decedent was exposed to asbestos materials and products which, as part of Decedent's living and employment, Decedent was forced to come into contact with and breathe, inhale, and ingest asbestos fibers and particles coming from said asbestos products and materials.

9. At all times pertinent hereto, Defendants were engaged in the business of contracting for, mining, milling, processing, manufacturing, designing, testing, assembling, fashioning, fabricating, packaging, supplying, distributing, delivering, marketing, and/or selling asbestos and asbestos products.

10. At all times pertinent hereto, the asbestos products contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged,

supplied, distributed, delivered, marketed, and/or sold by the Defendants reached the

Decedent without any substantial change in their condition from the time they were sold.

11. The foregoing asbestos products were defective in one or more of the following ways:

(a)     In that they were inherently dangerous to those who used, handled, came in

        contact with and/or inhaled said products and materials;

(b)     in that they failed to carry proper, adequate and correct warnings and information

        concerning the dangers of the said products;

(c)     in that they lacked proper safety precautions to be observed by users, handlers and

        persons, including the Decedent who would reasonably and foreseeably come into

        contact with the said products and materials;

(d)     in that they were packaged, bagged, boxed and/or supplied to the Decedent in

        packaging, bagging, boxes or other containers that were inadequate and/or

        improper.

(e)     in that the products were delivered to and reached the Decedent without adequate

        or proper handling  instructions, face masks and/or respirators;

(f)     in that any warnings, information and/or safety instructions said products may

        have carried were improper and inadequate in that they failed to adequately and

        reasonably  apprise users, handlers and persons coming into contact with the  said

        products and materials, including the Decedent, of the full scope and danger to

        their health of contact with asbestos products and materials, including the risk of

        cancer;

(g)     in that the said asbestos products and materials were not of merchantable quality;

7

(h)   in that the said asbestos products and materials were not fit and safe for their known and intended purposes and uses.

12. As a result of the above, the Decedent was caused to sustain severe, painful and permanent injuries such as described in Paragraphs 4 and 5 caused by Decedent coming into contact with, breathing, inhaling and ingesting asbestos fibers. The injuries and diseases from which the Decedent suffered was fatal and caused the Decedent to suffer great pain, suffering, mental anxiety, distress of mind, humiliation, emotional trauma and mental anguish.

13. The disease, diseases or injuries from which the Decedent suffered were directly and proximately caused by Decedent's exposure to asbestos and asbestos products which were mined, milled, manufactured, designed, assembled, fabricated, supplied, constructed, processed, packaged, distributed, delivered, purchased and/or sold by the Defendants.

14. As a result thereof, the Decedent's lifespan was shortened and Decedent's capacity to carry on life's activities has been impaired along with the Decedent's capacity to enjoy life and family, to engage in any gainful employment, and to participate in civic affairs.

15. As a result of said illness, the Decedent has been obligated to incur expenses for medical, hospital and surgical treatment, drugs, medicines, x-rays and medical apparatus.

16. As a further result of said illness, the Decedent's earning capacity was impaired.

17. The Defendants knew or should have known that the asbestos products and materials were inherently dangerous to those who used, handled or came in contact with said products and materials.

8

18. The Defendants failed to provide proper, adequate and correct warnings and information concerning the dangers of the products and materials to persons using, handling, or coming into contact therewith.

19. The Defendants failed to provide proper, adequate and correct warnings and instruction of safety precautions to be observed by users, handlers and persons, including the Decedent, who would reasonably and foreseeably come into contact with the said products and materials.

20. Any warnings, information and/or instructions of safety precautions were improper and inadequate in that, among other things, they failed to adequately and reasonably apprise users, handlers and persons coming into contact with the said products and materials, including the Decedent, of the full scope and danger to their health of contact with asbestos products and materials, including the risk of cancer.

21. The Defendants have been possessed of medical and scientific data, studies and reports since approximately 1929, which information clearly indicated that asbestos and asbestos-containing products were hazardous to the health and safety of the Decedent and other human beings.

22. The Defendants, during the 1930's, 1940's, 1950's and 1960's became possessed of voluminous medical and scientific data, studies and reports, which information conclusively established that asbestos and asbestos-containing products were hazardous to the health and safety of the Decedent and all humans exposed to the products.

23. The Defendants had numerous workers' compensation claims filed against them by former asbestos workers/employees, since the 1930's.

9

24. The Defendants have consistently failed to acknowledge, publish, or in any way advise others of studies and reports known throughout the industry, including studies conducted by or on behalf of various Defendants in the asbestos industry, since the 1920's.

25. Notwithstanding that the Defendants possessed the foregoing information, the Defendants wrongfully contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, and sold asbestos products and materials to the Decedent, the Decedent's employer(s) and/or to others working at the various jobsites and places of employment of the Decedent and the Defendants failed to render proper, adequate and correct warnings, advice, instruction and information and so acted in a grossly negligent, malicious, willful and wanton manner, and failed to use reasonable care under all circumstances, and wrongfully acted in other respects.

26. It was the continuing duty of the Defendants to advise and warn purchasers, consumers, and users, and all prior purchasers, consumers, and users, of all dangers, characteristics, potentialities and/or defects discovered subsequent to their initial marketing or sale of said asbestos and asbestos products.

27. The Defendants breached these duties by:

(i)     failing to warn the Decedent of the dangers, characteristics, and/or potentialities of the product or products when they knew or should have known that the exposure to the product(s) would cause disease and injury;

(j)     failing to warn the Decedent of the dangers to which the Decedent was exposed when they knew or should have known of the dangers;

(k)     failing to exercise reasonable care to warn the Decedent of what would be safe,

sufficient, and properly protective clothing, equipment, and appliances when

working with, near or during exposure to asbestos and asbestos products;

(l)     in that they were packaged, bagged, boxed and/or supplied to the Decedent in

packaging, bagging, boxes or other containers that were inadequate and/or

improper;

(m)     in that the products were delivered to and reached the Decedent without adequate

or proper handling instructions, face masks and/or respirators;

(n)     failing to test the asbestos and asbestos products in order to ascertain the extent of

dangers involved upon exposure;

(o)     failing to conduct such research that should have been conducted in the exercise

of reasonable care in order to ascertain the dangers involved upon exposure;

(p)     failing to remove the product or products from the market when the defendant

corporations knew or should have known of the hazards of exposure to asbestos

and asbestos products;

(q)     failing upon discovery of the dangers, hazards, and potentialities of exposure to

asbestos to adequately warn and apprise the Decedent of the dangers, hazards, and

potentialities discovered;

(r)     generally using unreasonable, careless, and negligent conduct in the contracting

for, mining, milling processing, manufacturing, designing, testing, assembling,

fashioning, fabricating, packaging, supplying, distributing, delivering, marketing,

and/or selling of their asbestos and asbestos products.

WHEREFORE, the Plaintiff claims damages.

11

## SECOND COUNT
### (Negligence)

28. Paragraphs 1 through 27 are incorporated herein as if set forth in full.

29. The Decedent was a foreseeable user and consumer of the Defendants' asbestos and

    asbestos products.

30. The Defendants owed the Decedent a duty of reasonable care to avoid causing him harm

    from exposure to their products.

31. The Defendants breached their duty in the numerous and various manner set forth above.

32. The Defendants' negligence directly and proximately caused the Decedent's asbestos

    disease and other lawful damages set forth above.

WHEREFORE, the Plaintiff claims damages.

## THIRD COUNT
### (Strict Product Liability)

33. Paragraphs 1 through 32 are incorporated herein as if set forth in full.

34. The foregoing acts of the Defendants were wrongful as to the Decedent within the

    intendment of Restatement, Torts 2d section 402A.

WHEREFORE, the Plaintiff claims damages.

## FOURTH COUNT
### (Breach of Warranty)

35. Paragraphs 1 through 34 are incorporated herein as if set forth in full.

36. The Defendants expressly and/or impliedly warranted that said asbestos materials and

    products were of merchantable quality, fit and safe for the purposes for which they were

    contracted for, mined, milled, processed, manufactured, designed, tested, assembled,

12

fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, sold, intended and used, as set out in their sales brochures, manuals and written warranties accompanying or preceding sales and distribution of their products, and in various other manners.

37. The Defendants breached said warranties in that said asbestos materials and products were not of merchantable quality, fit and safe for the purposes for which they were contracted for, mined, milled, processed, manufactured, designed, tested, assembled, fashioned, fabricated, packaged, supplied, distributed, delivered, marketed, sold, intended and used in that, among other things, adequate warning precautions and instructions were not provided to users, handlers, and persons coming into contact with said products and materials.

38. The Decedent's injuries and resulting damages set forth above were caused by breach of said warranties by the Defendants.

39. The Decedent was employed and lived in capacities which placed Decedent in close proximity with asbestos and asbestos-related materials, manufactured and/or distributed by one or more of the Defendants. Decedent's presence was known or should have been known to each of the Defendants.

WHEREFORE, the Plaintiff claims damages.

## FIFTH COUNT
### (Conspiracy)

40. As against Defendant Metropolitan Life Insurance Company (hereinafter "Met Life") only.

41. Plaintiff repeats and restates all allegations contained in all paragraphs above as if fully set forth herein.

13

42. Defendant, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Decedent.

43. The Defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

44. The Defendants acted in the following fashion:

(s)     Defendant Met Life insurance Company required a tangible <u>quid pro quo</u> from McGill University in the 1920's in exchange for providing funding for a study of asbestos disease in Canadian miners. The study revealed asbestos miners suffered from asbestosis. The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

(t)     In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted co-conspirator Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of his study showed that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issues of asbestos disease. Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

(u)     Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and Attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr.

14

Lanza, Associate Medical Director of Met Life (insurer of conspirators Johns-Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the Defendants and their co-conspirators that affirmatively misrepresented asbestos as a disease process as being less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. Defendant Met Life was motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits and workers' compensation claims involving Manville, Raybestos, Met Life, and others.

(v)     In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Russell Manufacturing, Union Asbestos & Rubber Company, and defendant United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On

15

numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

(w)   On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation:  American Brake Block Division of American Brake and Shoe foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company, and defendant U.S. Gypsum Company (hereafter U.S. Gypsum).  U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

(x)   At this November 11, 1948 meeting, these Defendants, co-conspirators and their respective representative decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

(y)   At this meeting, the Defendants and their co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published in the medical literature as edited by Dr. Arthur Vorwald.  The acts of

16

these conspirators were carried out by co-conspirator defendant Met Life's agent, Dr. Lanza. The Defendants and co-conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Decedent.

(z)     As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (hereinafter "TLVs"). Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work. The Defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading publication to university libraries, government officials, medical doctors, agencies, the public, and others.

(aa)    Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

(bb)    The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.) : Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation),

17

defendant National Gypsum Company (k/k/a Asbestos Claims Management Corporation), and defendant Turner & Newall (individually and successor to Bell asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

(cc)   Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

(dd)   This plan of misrepresentation and influence over the medical literature began in or about 1950 when Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

(ee)    As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. Smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, inter alia, U.S. government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations, and the general public, including Decedent.

(ff)    Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

(gg)    The Q.A.M.A. Defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

(hh)    By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. Defendants

19

affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

(ii) In approximately 1958, the Q.A.M.A. Defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

(jj) The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the "TLV" value due to the cancer risk associated with asbestos inhalation.

(kk) In 1967, Q.A.M.A. Defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

(ll) In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

(mm) At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risk from the public, these Defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the

conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac Agreement required by the asbestos industry members.

(nn)   The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA):  Phillip-Carey Corporation (predecessors to Celotex), Johns-Manville, and others.

(oo)   In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual.  This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

(pp)   The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI):  Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego defendant Turner & Newall), defendant National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

(qq)   In 1947, the members of the ATI received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure.  These Defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable.  Thereafter, these defendant

21

conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

(rr)    In 1953, defendant and conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

(ss)    In 1955, conspirator Johns-Manville through its agent Kenneth W. Smith, M.D., caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

(tt)    In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

(uu)   In 1957, the members of the ATI jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

(vv)   In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

(ww)   In 1970, through their agents, co-conspirators Celotex Corporation and Carey-Canada affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease.  This constituted a fraudulent misrepresentation about the material facts known to these conspirators.

(xx)   All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza, M.D., acting on behalf of defendant Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

45. All of the aforementioned Defendants:

(yy)   did a tortuous act in concert with the other or pursuant to a common design with them

23

(zz)   knew that each other's conduct constituted a breach of duty and they each gave a substantial assistance or encouragement to the other so to conduct himself; and/or

(aaa)   gave substantial assistance to the other in accomplishing a tortuous result and its own conduct, separately considered, constitutes a breach of duty to the Decedent.

46. The acts of the Defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Decedent in the following manner:

(bbb)   The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

(ccc)   The Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

   i.   maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

   ii.   assist in the continued pecuniary gain of the Defendants through the sale of their products;

   iii.   influence, in the Defendants' favor, proposed legislation to regulate asbestos exposure and;

   iv.   provide a defense in lawsuits and workers compensation claims brought for injury resulting from asbestos disease.

24

(ddd)  The Decedent reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to it because of a belief that it was safe.

(eee)  The Defendants individually, as members of a conspiracy, and as agents of each other intended that Decedent rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products, to continue Decedent exposure to these products.

(fff)  The Defendants individually, as members of a conspiracy, as agents of each other, and as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Decedent had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

(ggg)  The Decedent suffered and will continue to suffer injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of the Defendants, Decedent suffered serious bodily injury, endured and will continue to endure great pain and suffering, incurred and will continue to incur medical expenses, suffered and will continue to suffer mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

(hhh)   The Decedent will continue to suffered injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of the Defendants, Decedent will continue suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

## SIXTH COUNT
### (Wrongful Death)

47. Decedent hereby realleges and incorporates by reference Paragraphs 1 through 46.

48. As a result of the Decedent's exposure to and coming in contact with asbestos and asbestos containing products, and Decedent's inhaling and ingesting fibers from said asbestos and asbestos-containing fibers that were manufactured, produced, sold and/or supplied by the Defendants, the Decedent died February 6, 2007.

WHEREFORE The Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus whatever other further relief this Honorable Court deems right and just, including but not limited to:

(a)   $1,000,000. in compensatory damages;

(b)   $1,000,000. in punitive damages;

(c)   Exemplary damages, including attorneys fees; and

(d)   Interest and costs.

The Plaintiff demands trial by jury.

Dated at Providence, Rhode Island, this the ___ day of February 2009.

Respectfully Submitted

By: _____

John Deaton, Esq. (RI Bar # 6537)
One Richmond Square, Suite 163W
Providence, RI 02906
(401) 351-6400
(401) 351-6401  fax

## CERTIFICATION

This is to certify that the above document was filed via hand-delivery with the Rhode Island Superior Court this 6th day of February 2009.

_____

Vanessa Dennis

STATE OF RHODE ISLAND                      SUPERIOR COURT
PROVIDENCE, SC.                            CIVIL ACTION NO.: 96-9999

IN RE ASBESTOS LITIGATION

## COURT-COUNSEL PROTOCOL REGARDING ASBESTOS LITIGATION

### I.     INTRODUCTION

Except as noted below, this Protocol shall apply to all pending and future cases in the

Rhode Island State Court Asbestos Personal Injury Litigation [1] hereinafter ("Asbestos

Litigation"). To the extent that the provisions of this Protocol are inconsistent with any prior

Orders of this Court, the provisions of this Protocol shall supersede inconsistent provisions of

prior orders.

This Protocol shall apply to all documents (including any exhibits or attachments to said

documents) that parties to the Asbestos Litigation are required by Rhode Island Rules of Civil

Procedure or any applicable Case Management Order to serve on counsel of record, except that it

shall not apply to service of summonses and complaints, which shall continue to be served

pursuant to Rule 5 of the Super.R.Civ.P. In addition, nothing in this Protocol shall have any

effect on the process by which documents are filed with the Court. The parties must continue to

file all documents in paper form with the Court according to the applicable

---

[1]     Individual Rhode Island Asbestos Litigation cases are designated as asbestos cases on the Superior Court
Civil Case Cover Sheet.

1

Rules and Case Management Orders.  This Protocol is not intended to affect the substantive rights of any party with respect to any document.

## II.   ELECTRONIC SERVICE

1.   Rule 1 of the Super.R.Civ.P. provides that the rules of civil procedure "shall be construed to secure the just, speedy and inexpensive determination of every action."

2.   Rule 16 of the Super.R.Civ.P. provides that the court may in its discretion direct the attorney for the parties to appear before it to consider ". . . such other matters as may aid in the disposition of the action.  Further, Rule 5(b)(2)(D) of the Super.R.Civ.P. (amended 2006) provides that service of pleadings and other papers may be made by delivering a copy by electronic means so long as the person upon whom service is being made has consented to such service in writing.

3.   The Court has pending before it at any given time dozens or even hundreds of active asbestos-related claims that have been assigned to the Honorable Alice B. Gibney.  In these cases, one (1) of three (3) law firms[2] usually represents the plaintiffs and there are often many of the same defendants represented by many of the same defense counsel.  Many of the pleadings, motions and discovery served in these cases are similar or identical in all the cases.  Each case often involves the service of hundreds of such documents.

4.   Many of the parties in all the asbestos litigation assigned to this justice have been serving motions and discovery and amended pleadings upon each other by email and have found this to be a speedy and inexpensive method of service.

5.   Accordingly, except as set forth in Paragraphs 6 and 7 all documents (including exhibits or attachments to said documents) that parties to the asbestos litigation are required by the Rhode Island Rules of Civil Procedure and any applicable Case Management Order to serve on counsel of record, may be served electronically via Lexis-Nexis File & Serve ("Lexis"), in Portable Document Format (PDF) only, to all parties.  This Protocol does not affect Rule 5(b)(2)(D)(3) (amended 2006) of Super.R.Civ.P. which provides that service by electronic means under Rule 5(b)(2)(D) is not effective if the party making service learns that the intended service did not reach the person to be served.  Any document served electronically shall be otherwise identical to its appearance as filed with the Court, including the signatures of parties and counsel except as provided in Paragraph 17.  Electronic service shall be deemed complete upon transmission unless the party making service learns that the

---

[2]   Early Ludwick & Sweeney, Motley Rice LLC, and The Deaton Law Firm.

2

attempted service did not reach the person to be served. If the document served electronically requires a response and none is received within the allotted time, prior to any default, deemed admissions or other adverse consequence to the failure to respond to discovery or pleading, the serving party shall give notice of non-response (including a copy of the earlier-served document) by e-mail and by hard copy (hard copy is defined herein as first class mail, overnight delivery, hand delivery or facsimile) to the non-responding party, who shall then have ten (10) days from receipt of the hard copy to respond before being held in default or being deemed to have admitted any matter or otherwise be subject to adverse consequences from the failure to respond. Any document transmitted via email shall certify in the Certificate of Service that a true and correct copy was electronically served to counsel of record via email list service.

6.     This Protocol does not affect the filing of papers with the Court and shall apply only to the service of documents. Original documents must still be filed as provided by Super.R.Civ.P. 5 or any other applicable provision of law.

7.     This Protocol does not affect the manner of service of summons and complaints and third-party complaints under Super.R.Civ.P. Rules 4 and 14. Further, this Protocol is not intended to pertain to the service of correspondence on any party other than correspondence directed to the Court. Any party at his or her option may utilize electronic service for the service of correspondence on any party. If a party elects not to use electronic service for the service of correspondence other than correspondence directed to the Court, he or she may utilize one or more of the following methods of service: first class mail, overnight delivery, express mail, hand delivery, facsimile, certified or registered mail, or email outside of electronic service contemplated in this Protocol.

8.     Except as provided in Paragraphs 6 and 7, all parties shall receive service solely by electronic means. Pursuant to Rule 5 (b)(2)(D), a signed Order Authorizing Electronic Service of Documents will constitute consent by all parties to the asbestos litigation.

## III.   PROCESS FOR ELECTRONIC SERVICE OF DOCUMENTS

9.   LexisNexis File & Serve ("Lexis") shall make available to the Court (for the limited purpose of access to certain documents not for the purposes of filing) and to the parties in this litigation a system for providing electronic service, storage and delivery of documents ("the system").

10.   A party seeking to effectuate service of a document covered by this Protocol, shall send the document to Lexis by one of following three means of delivery:

(a)   electronic transfer via the Internet to Lexis (the document being either a scanned executed document or a scanned image of a document);

(b)   fax transmission; or

(c)   via overnight mail or U.S. mail addressed to Lexis.

11.   The cost per transaction (documents including exhibits) for service via Lexis shall be $13.00 ("single transaction fee") if electronic transfer method is used. Lexis will charge an additional fee of $.30 per page if the document is faxed or mailed to Lexis for upload. Lexis shall collect the above-referenced fees in the form of an invoice sent to each firm on a monthly basis.

12.   A "transaction" is: (a) the uploading/service of document(s) and any related exhibits and attachments to the document(s) of any aggregate length in any single case; or (b) the uploading/service of document(s) and any related exhibits and attachments to the document(s) of any aggregate length in multiple cases. A multiple case service option will be available to parties for a single transaction fee, which will allow a party to add multiple captions to one single transaction for the uploading/service of document(s) and any related exhibits and attachments to the document(s).

13.   Regardless of transmission method, all document service must be initiated on the website by a registered user. Lexis shall then convert all documents into Adobe Portable Document Format (pdf) and make them available to parties on an Internet website maintained by Lexis ("the Website").

14.   Lexis shall post all documents to the Website according to the following timetable:

(a)   Electronic documents shall be posted to the Website within one (1) hour of receipt of such document from a registered user;

(b)   Faxed documents shall be posted to the Website within six (6) business hours of receipt from a registered user; and

4.

(c)     Mailed paper copy documents shall be posted to the Website within twenty-four (24) hours of receipt of the overnight mail package.

15.     Loss of internet connectivity on the part of a user shall not extend any service or filing deadlines except as provided in the paragraph. For any day or partial day that the Lexis system is out of service, deadlines applicable to service of documents pursuant to this Protocol shall be extended by one full business day. Where the occurrence of an event causes a loss of a user's internet connectivity or causes an inability to access the Lexis system, that user may serve opposing counsel and liaison counsel by email (outside of electronic service contemplated in this Protocol) or by "hard copy" (see paragraph 5), and upload the document to the Lexis system once internet connectivity is reestablished. Moreover, in the event that the Lexis system service is not functioning for more than one day, a party may serve opposing counsel and liaison counsel by email (outside of electronic service contemplated in this Protocol) or by "hard copy" (see paragraph 5) and then through the Lexis service once such service is functioning.

16.     Lexis shall maintain a "Single Case" docket for service in an individual case, and an "All Cases Docket" (also known as "In Re: Asbestos Litigation Docket," Docket No.: 96-9999) for documents filed on the Rhode Island Asbestos Litigation Consolidated Docket. Case-specific documents shall be posted to the "Single Case" docket, not the "All Cases Docket."

17.     Documents posted on Lexis need not contain visual representations of the filing attorneys' signatures. Where it is not possible for the attorney to insert an original signature, attorneys shall (in place of a signature and where the signature would normally appear) place the following declaration: "Original Signature on File." Original documents filed with the Court must contain original signatures in conformance with the Rhode Island Rules of Civil Procedure.

18.     Access to the Lexis system shall be limited to registered users. Registered users shall consist of Court personnel as authorized by the Justice responsible for such asbestos litigation and counsel of record or their designees within their law firms. Lexis shall provide each registered user with a username and password to access the system. Lexis personnel shall perform all administrative functions for the system, except that registered users may use the "Case Management" function to adjust their mappings (i.e. add or delete registered users who receive electronic notification in any given case).

19.     Any document electronically served pursuant to this Protocol shall be deemed served as of the date and time it is transmitted to Lexis. Any document transmitted to the system shall certify in the Certificate of Service that a true and correct copy was electronically served to counsel of record via Lexis. A

5

document is deemed to have been served via the Lexis system on a given date so long as it is served via the Lexis system no later than 11:59 p.m. Eastern Time on such date. Documents served via the Lexis system after 11:59 p.m. Eastern Time on a given date will be deemed served the next business date.

20.   Instructions for use of the Lexis system shall be posted on the Lexis Main Menu, which is displayed each time a user logs onto Lexis.

21.   Unless ordered by the Court, no documents that are filed under seal ("sealed documents") shall be served via the system. Rather, service of sealed documents shall be made pursuant to Rule 3.3 of the Superior Court Rules of Procedure.

## IV. ADDITION OF NEW CASES OR NEW PARTIES TO THE SYSTEM/ RESPONSIBILITIES OF PARTIES

### Plaintiffs' counsel responsibilities:

22.   For each new case filed on or after this Protocol, Plaintiffs' counsel shall, within forty-eight (48) hours of filing the complaint; (a) contact Lexis to initiate the electronic case docket or initiate it directly on the system, and (b) contact Lexis to map to the case docket all defendants (who have a registered user) named in the case.

### Defense counsel responsibilities:

23.   Defense counsel must designate one user within their law firm who will be responsible for receiving service on behalf of their defendant. It shall be responsibility of each individual defense counsel/firm to map any additional users whom they wish to receive service for any defendant(s) by utilizing the Case Management functions on the Lexis system. See also Paragraph 24 regarding the addition of new parties. Once an additional user is mapped to a defendant, that user will be automatically mapped to every existing or new case in which that defendant is named.

### Joint plaintiffs' counsel/defense counsel responsibilities:

24.   When a party serves a motion or pleading seeking to add new parties to a case, the serving party shall, within forty-eight (48) hours of serving the motion or pleading, request that Lexis map to the case docket all parties (who have a registered user) sought to be added. If a party sought to be added does not have a registered user, the moving party shall serve the motion pursuant to Rule 5 of the Super.R.Civ.P.

6

25.   When a new party to the asbestos litigation is named or added in a case, the party seeking to name or add the new party shall serve a copy of this Protocol upon the new party simultaneously. New parties that are not added to a case by an existing party, will be provided with a copy of this Protocol by Defendants' liaison counsel after counsel for such party has entered an appearance in the case. All new parties shall, within twenty (20) days of receipt of service of this Protocol, contact Defendants' liaison counsel to provide the appropriate contact information and to designate registered users to receive service on behalf of the new defendant for the service. All subsequent service to that party shall be made electronically in accordance with the provisions above, except as otherwise stated in paragraphs 6 and 7.

## V.   IMPLEMENTATION OF LEXIS NEXIS

26.   Implementation of the Lexis system shall take place forty-five (45) days within the Court's execution of this Protocol.

BY ORDER:

_Denise McHuerl_
_Deputy Clerk_

ENTER:

_[signature]_

DATE:

_1/9/08_

7

SUBMITTED BY:

Stephen T. Armato #6395
Cetrulo & Capone LLP
321 South Main Street
Providence, RI 02903
Telephone: 401-274-7850
Facsimile: 401-224-9670

Jennifer A. Whelan #6952
McGivney & Kluger, P.C.
72 Pine Street
Providence, RI 02903
Telephone: 401-272-5300
Facsimile: 401-331-7454

8

721397v1

Deaton Law Firm
One Richmond Square, 163 W
Providence, RI 02906





# FIRST CLASS MAIL

Chrysler LLC, f/k/a Daimler-Chrysler Corporation
CT Corporation System
10 Weybosset St.
Providence, RI 02903

